# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# NORTHERN DIVISION
# AT COVINGTON

CIVIL ACTION NO. 20-98-DLB-CJS

MICHAEL EVANS                                                            PLAINTIFF

v.                      **MEMORANDUM OPINION AND ORDER**

NOVOLEX HOLDINGS, LLC, et al.                          DEFENDANTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This matter is before the Court on Novolex Holdings, LLC and Waddington Group, Inc.'s Motion to Dismiss (Doc. # 12). The Motion has been fully briefed, (Docs. # 16 and 22), and is now ripe for the Court's review. For the reasons stated herein, Defendants' Motion to Dismiss is **granted in part** and **denied in part**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On July 14, 2020, Plaintiff Michael Evans filed breach of contract and conversion claims against Defendants Novolex Holdings, LLC ("Novolex") and The Waddington Group, Inc. ("TWG"). (Doc. # 1 ¶¶ 26, 30). On September 14, 2020, Defendants Novolex and TWG filed a Motion to Dismiss Plaintiff's Compliant for failure to state a claim. (Doc. # 12). Plaintiff's causes of action arise from a contract dispute over award incentives Plaintiff asserts were wrongfully withheld.

Plaintiff Evans was employed by TWG as its President and CEO until his retirement in 2017. (Doc. # 1 ¶¶ 7, 13). Upon Evans's retirement, John Wurzburger succeeded him as President and CEO. (*Id.* at ¶ 13). In April of 2016, TWG's parent corporation, Jarden, was acquired by Newell Brands. (*Id.* at ¶ 12). In June of 2017,

1

Newell Brands sold TWG to Novolex. (*Id.* at ¶ 14). As part of this sale, Novolex assumed the obligations under a Special Incentive Plan ("SIP") which compensated TWG's management for achieving performance targets from 2016 through 2019. (*Id.* at ¶¶ 9, 15). Novolex agreed to a downward adjustment of the purchase price in order to fund the pro-rated portion of the SIP bonuses for the time prior to the sale, which was to be paid out to management in March 2019. (*Id.* at ¶ 14). While Evans retired in 2017, he still remained an eligible participant under the SIP. (*Id.* at ¶ 13). After Novolex's purchase of TWG, it terminated the current CEO and President Wurzburger for cause. (*Id.* at ¶ 16). Wurzburger would have been eligible for more than three million dollars from the SIP bonuses. (*Id.*). Unfortunately for Wurzburger, because he no longer was in good standing with TWG, his bonus was forfeited. (*Id.* at ¶¶ 16, 18). In March of 2019, Novolex and TWG paid a portion of the bonuses to eligible participants. (*Id.* at ¶ 17). However, Wurzburger's forfeited bonus, which was more than three million dollars, was not distributed. (*Id.* at ¶¶ 18-20).

Plaintiff contends that Novolex and TWG were required to return the bonus forfeited by Wurzburger to the award pool to be redistributed among the remaining participants based on the terms of the SIP and prior practice of the Administrative Committee. (*Id.* at ¶¶ 19-20). Novolex and TWG did not return the funds to the award pool. (*Id.* at ¶ 20). Further, after acquiring TWG, Novolex revised the performance targets which needed to be met before a participant would receive an award. (*Id.* at ¶ 21). Novolex did not provide written notification of this change to Evans or other eligible participants. (*Id.*). Novolex later informed Evans and the other eligible participants that

they did not meet the revised performance targets and therefore were ineligible for further payments under the SIP. (*Id.* at ¶ 22).

The instant controversy largely revolves around the SIP. The SIP itself is a five-page document that outlines a structure for awarding plan participants based on specific performance targets. (*See* Doc. # 11). The purpose of the SIP was to incentivize management of TWG. (*Id.* at 1). The SIP is managed by an Administrative Committee ("the Committee"). (*Id.* at 2). Following the firing of Wurzburger, the parties disagree on how the Committee should have allocated the bonuses owed to Wurzburger based on the language of the SIP. Plaintiff contends that the Committee was required to return the award forfeited by Wurzburger to the award pool, then reallocate the money to other participants. (Doc. # 1 ¶¶ 19, 20, 27). Defendants instead argue that the SIP merely authorized the Committee to return forfeited awards to the pool if the Committee so chooses. (Doc. # 12 at 6). Further, Plaintiff states that Defendants failed to pay the remaining incentives earned by participants due to their unilateral change of the performance goals. (Doc. # 1 ¶¶ 21, 22, 23, 27). In rebuttal, Defendants argue that the Committee, in its sole discretion, could change the performance targets and therefore Defendants were not required to pay Plaintiff or any other SIP participants awards which they had not earned. (Doc. # 12 at 7-8).

## II. ANALYSIS

### A. Standard of Review

Granting a motion to dismiss is appropriate if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Further, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In order to have "facial plausibility," the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Id.*) (quoting *Twombly*, 550 U.S. at 556). In evaluating a motion to dismiss, a court should "construe the complaint in the light most favorable to the plaintiff" and "accept all well-pleaded factual allegations as true." *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017) (citing *Ashcroft*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570). However, "mere conclusory statements, do not suffice" and legal conclusions "must be supported by factual allegations." *Ashcroft*, 556 U.S. at 678-79. Generally, a determination at the motion to dismiss stage "is purely a matter of law." *Benningfield v. Pettit Environ., Inc.*, 183 S.W.3d 567, 570 (Ky. Ct. App. 2005) (quoting *James v. Wilson*, 95 S.W.3d 875, 884 (Ky. Ct. App. 2002)).

B. **Matters Outside the Pleadings**

In support of their Motion to Dismiss, Defendants heavily rely on the language of the SIP. In evaluating a motion to dismiss, a court is required to only consider the complaint and attached exhibits, items in the record, and "documents that a defendant attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim." *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (quoting *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997)). If documents beyond this scope are considered, the motion to dismiss will be converted into one for summary judgment. *Spencer v. Grand River Nav. Co., Inc.*, 644 F. App'x 559, 561-62 (6th Cir. 2016) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). The SIP

4

was filed in conjunction with Defendants' Motion to Dismiss, (*see* Doc. # 10 at 1), and was repeatedly referenced in Plaintiff's Complaint, (*see* Doc. # 1 ¶¶ 9, 12-23, 26-27, 30). Therefore, the SIP may properly be considered in evaluating Defendants' Motion to Dismiss without converting the Motion into a motion for summary judgment.

### C.    Choice of Law

Defendants assert that Delaware law controls because of Section 11 of the SIP, entitled "Governing Law," which states:

> The validity, construction and effect of the Plan and any rules and regulations relating to the Plan shall be determined in accordance with the laws of the State of Delaware and applicable federal law, without references to principles of conflict of laws which would require application of the law of another jurisdiction.

(Doc. # 11 at 4). By contrast, Plaintiff contends that under choice of law analysis, Kentucky is the state that has the most significant relationship with the contract. (Doc. # 16 at 2). Because this suit is in federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332, (*See* Doc. # 1 ¶¶ 1-4), the Court "must apply the substantive law, including choice of law rules, of the state in which it sits." *Phelps v. McClellan*, 30 F.3d 658, 661 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Therefore, Kentucky's choice of law rules apply. Kentucky courts prefer applying Kentucky substantive law "whenever possible," *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983), and therefore "the Court begins from a default presumption that Kentucky law will apply barring 'overwhelming interests to the contrary,'" *Nat'l Info. & Commc'ns Equip. Network Inc. v. Willigan*, No. 06-28, 2007 WL 2979928, at *3 (E.D. Ky. Oct. 11, 2007) (quoting *Harris*, 712 F.2d at 1071)).

5

Here, Plaintiff asserts a breach of contract claim and a conversion claim, meaning that he has both a contract and a tort cause of action. (Doc. # 1 ¶¶ 26, 30). A separate choice of law analysis is necessary for each of these claims. *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). In contract claims, Kentucky applies the test set forth in the Restatement (Second) of Conflict of Laws § 188. *Acuity Brands, Inc. v. Bickley*, 172 F. Supp. 3d 971, 981 (E.D. Ky. 2016) (citing *Saleba*, 300 S.W.3d at 181). The Restatement provides that the law of the state with "the most significant relationship to the transaction and the parties" will control. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (Am. Law Inst. 1971). In considering the state that has the most significant relationship with the parties, the Court should take into account: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* Alternatively, for tort claims, like conversion, Kentucky law applies "if there are significant contacts—not necessarily the most significant contacts—with Kentucky." *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972).

As for the effect of a choice of law provision, like the one found in Section 11 of the SIP, "Kentucky's most-substantial-relationship test trumps even an otherwise-valid choice of law clause when the dispute is centered in Kentucky." *Osborn v. Griffin*, 865 F.3d 417, 444 (6th Cir. 2017) (also noting that the Kentucky Supreme Court "will apply its own law to a dispute with ties to Kentucky, even in spite of an otherwise-valid choice of law clause"); *see also Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 393 (6th Cir. 2000) ("Kentucky courts will not automatically honor a choice-of-law provision, to the exclusion of all other considerations.").

Here, despite the choice of law provision contained in the SIP, Kentucky law governs Plaintiff's breach of contract claim, as Kentucky has the most substantial relationship to the contract and parties.[1] While Defendant Novolex (a Delaware company) owns Defendant TWG (also a Delaware corporation), TWG has its principal place of business in Covington, Kentucky. (Doc. # 1 ¶¶ 2-3). Further, although Plaintiff Evans is a resident of Ohio, he worked for over twenty years at TWG's principal place of business in Kentucky. (*Id.* at ¶¶ 1, 7). The SIP itself rewards TWG management for achieving performance targets. (*Id.* at ¶ 9). Because no party asserts otherwise, the Court will assume that the participants in the SIP, as management level employees of TWG, worked at TWG's principal place of business in Covington, Kentucky and therefore Kentucky is likely the place of performance under the contract. Defendants only argument to the contrary is that Kentucky courts must apply choice of law provisions in contracts. (Doc. # 12 at 4) (citing *Asher v. Unarco Material Handling, Inc.*, 737 F.Supp.2d 662, 671 (E.D. Ky. 2010)).[2] Because the aforementioned factors favor applying Kentucky law, and because Defendants did not make any argument otherwise as to any of the remaining factors, and because Kentucky courts prefer applying Kentucky law, the Court will apply Kentucky law to the contract claim. Similarly, as for the conversion claim, Kentucky law will apply. The choice of law analysis in tort is even less stringent than that in contract—

---

[1] This conclusion is based on the facts available to the Court in the record. Defendants did not present an argument on the choice of law analysis except for arguing that the SIP's choice of law provision should control. (*See* Doc. # 12 at 4).

[2] Notably, the decision that *Asher* relies on, *National Union Fire Ins. Co. v. Watts*, 963 F.2d 148 (6th Cir. 1992), was decided twenty years before the now controlling case on the matter, *Osborn v. Griffin*, 865 F.3d 417 (6th Cir. 2017).

7

it only requires that there be significant contacts with Kentucky, which has clearly been established. *See Foster*, 484 S.W.2d at 829.[3]

D. **Breach of Contract**

Defendants first argue that Plaintiff's breach of contract claim fails as a matter of law based on the plain language of the SIP. The relevant portions of the SIP are excerpted below. Section 4.6 provides:

> In the event that any Award is forfeited due to a Participant ceasing to be employed by TWG or its Affiliates, the Administrative Committee shall have the authority to return such funds to the Award Pool to be awarded by the Administrative Committee to any other Eligible Participant in the amounts determined by the Administrative Committee. . . .

(Doc. # 11 at 3). Section 5 further illuminates the Committee's responsibilities in managing the SIP:

> The Administrative Committee shall have authority to prescribe, amend and rescind rules and regulations relating to the Plan . . . to interpret the Plan and to make all other determinations necessary or advisable for the administration and interpretation of the Plan and to carry out its provisions and purposes. Any determination, interpretation or other action made or taken . . . by the Administrative Committee pursuant to the provisions of the Plan, shall, to the greatest extent permitted by law, be within its sole and absolute discretion and shall be final, binding and conclusive for all purposes and upon all persons and shall be given deference in any proceeding with respect thereto. . . .

(*Id.* at 4). Finally, Sections 3 and 4.2, read together, explain the awards and how they relate to the performance targets:

> [T]he Plan shall continue until the later of (a) December 31, 2019, and (b) the date that all awards made under the Plan have either been paid or have been determined by the Administrative Committee to be unearned due to

---

[3] Defendants argue that Kentucky choice of law rules do not apply because Kentucky and Delaware law do not conflict, but Defendants make no effort to demonstrate that this is in fact a false conflict which would render the choice of law issue moot. (*Id.* at 2). Therefore, the Court finds it necessary to perform a choice of law analysis for the tort claim.

8

the failure of TWG to meet the requirements of Section 4.2 (the "Performance Period").

(*Id.* at 2) (Section 3).

> Each Award under the Plan shall entitle the Participant to a cash bonus payment determined by multiplying the Award Target Payment set forth in such Participant's Award Letter by a percentage, the numerator of which shall be the amount, if any, by which the actual average Adjusted EBITDA of TWG for the four fiscal years beginning January 1 and ending on December 31 of 2016, 2017, 2018, and 2019 exceeds $160,000,000, and the denominator of which shall be $20,000,000; provided, however that: (a) the maximum value of any Award shall be the Award Target Payment, and (b) no payment shall be made in any amount in respect of the Award if (i) annual Adjusted Revenue of TWG for the period from January 1, 2016 through December 31, 2019 shall not have increased by a compound annual growth rate of at least four percent (4.0%), and (ii) Adjusted Revenue of TWG for the period from January 1, 2019 through December 31, 2019 shall not have exceeded $945,000,000. The Administrative Committee (with the approval of the CEO) may modify the rates or dollar amounts in the preceding clause (b) due to the material change in resin prices that the Administrative Committee determines have had a material impact on TWG's financial performance. In addition, the Administrative Committee (with the approval of the CEO) may adjust the dollar amounts in this Section 4.2 to reflect the results of mergers, acquisitions, divestitures, or other business combinations that have had at the time of such determination, an impact on TWG's financial performance; provided that such adjustments shall be made by the Administrative Committee solely to reflect the actual financial results of any acquired or divested businesses.

(*Id.* at 3) (Section 4.2).

In his Complaint, Plaintiff asserts that Defendants breached the SIP in the following two ways: (1) by not returning Wurzburger's forfeited award funds back to the pool to be redistributed to other participants in the SIP and (2) by revising the performance targets so as not to distribute the remaining award funds. (Doc. # 1 ¶¶19-23, 27).

### 1. *Refusal to Return Forfeited Funds Back to the Award Pool*

Defendants seek dismissal of Plaintiff's breach of contract claim based on their failure to redistribute Wurzburger's forfeited funds, because according to Defendants, under the plain language of the SIP, the Administrative Committee was not required to

9

return the funds to the award pool or to redistribute the funds. This argument hinges largely on one imperative phrase—"the Administrative Committee shall have the authority to return such funds to the Award Pool." (Doc. # 11 at 3). Defendants assert that this language is permissive, giving the Committee the authority to return the funds, but not mandating that it do so. (Doc. # 12 at 6).

Under Kentucky law, "words in a contract are to be given their 'ordinary meaning as persons with ordinary and usual understanding would construe them.'" *Sunny Ridge Enters., Inc. v. Fireman's Fund Ins. Co., Inc.*, 132 F. Supp. 2d 525, 526 (E.D. Ky. 2001) (quoting *Transp. Ins. Co. v. Ford*, 886 S.W.2d 901, 904 (Ky. App. 1994)); *see also Weaver v. Caldwell Tanks, Inc.*, 190 F. App'x 404, 409 (6th Cir. 2006) ("words in a clear and unambiguous contract are to be given their commonly understood meanings unless they are technical terms"). However, if a contract is ambiguous, the doctrine of contemporaneous construction applies, meaning that "courts are required to give great weight to the interpretation which the parties have placed on an ambiguous contract. The construction of the parties is best evidenced by their conduct with respect to the agreement." *Weaver*, 190 F. App'x at 411 (quoting *A.L. Pickens CO., Inc. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir. 1991)). If the meaning of the contract is clear and unambiguous, parol evidence is not admissible. *Id.* at 412. Further, "[g]enerally, the interpretation of a contract, including determining whether a contract is ambiguous, is a question of law for the courts . . . ." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

Therefore, the relevant question is the meaning of the phrase from Section 4.6: "the Administrative Committee shall have the authority to return such funds to the Award

Pool." (Doc. # 11 at 3). The phrase contains a grant of authority to the Administrative Committee which allows it to return forfeited funds to the Award Pool to distribute to other participants in the SIP. The determinative inquiry is whether the phrase *requires* the Administrative Committee to return these funds to the Pool or whether it simply *permits* the Committee to do so in its discretion. When Section 4.6 is read with Section 5, which allows the Committee to make decisions in its "sole and absolute discretion," it is clear that the contract intended to give the Committee wide latitude to make decisions related to the administration of the SIP. (*Id.* at 4). Similarly, the phrase "shall have the authority" is equally permissive, as the contract's drafters could have simply used "shall" to convey that the Committee was required to return forfeited award funds to the Pool. As words in a contract are meant to be given their ordinary meaning, the most logical conclusion is that "shall have the authority" permitted the Committee to redistribute award funds, but did not require it to do so.

While Plaintiff contends that the Committee's prior practice was to return forfeited awards to the Pool so that they could be redistributed, because the contract governing the SIP is not ambiguous, considering the Committee's previous conduct would be inappropriate.[4] *See Cantrell Supply*, 94 S.W.3d at 385 ("Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence.") (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)). Because the terms of the contract are not ambiguous, and therefore the

---

[4] The SIP further provides that the "Committee's determinations under the Plan need not be uniform and may be made by the [] Committee selectively among persons who receive, or are eligible to receive, Awards under the Plan, whether or not such persons are similarly situated." (Doc. # 11 at 4). Therefore, even if the Court were to evaluate the Committee's prior practice, it is not clear that the previous conduct would control.

11

Committee was not required to return forfeited funds back to the Pool, Defendants' Motion to Dismiss as to Plaintiff's breach of contract claim is granted to the extent that claim is based on Defendants' failure to return funds to the Pool.

### 2. *Revision of Performance Targets*

Defendants also seek dismissal of Plaintiff's breach of contract claim insofar as Plaintiff alleges that Defendants impermissibly revised the SIP's performance targets and did not distribute "the incentives earned by the eligible participants, including Evans, under the SIP." (Doc. # 12 at 5, 7-9). Defendants contend that Plaintiff failed to state a claim showing he is entitled to relief, because the award was not guaranteed and the Committee had the sole discretion to change the performance targets, which Plaintiff failed to meet. (*Id.* at 7-9).

As discussed above, Section 5 of the SIP bestowed on the Committee the power, within its "sole and absolute discretion," to interpret the SIP and prescribe, change, or rescind rules related to the SIP. (Doc. # 11 at 4). However, this Section cannot be read alone. Section 4.2 also provides instructions for how the Committee should handle changing the targets. (*Id.* at 3). Specifically, it states: "no payment shall be made in any amount in respect of the Award if (i) annual Adjusted Revenue of TWG for the period from January 1, 2016 through December 31, 2019 shall not have increased by a compound annual growth rate of at least four percent (4.0%), and (ii) Adjusted Revenue of TWG for the period from January 1, 2019 through December 31, 2019 shall not have exceeded $945,000,000." (Doc. # 11 at 3). Section 4.2 goes on to clarify that if the Committee wants to modify the award target, it may do so "due to the material change in resin prices

that the Administrative Committee determines have had a material impact on TWG's financial performance." (*Id.*).[5]

As stated in the Restatement (Second) of Contracts § 203(c): "[i]n the interpretation of a promise or agreement or term thereof, the following standards of preference are generally applicable . . . (c) specific terms and exact terms are given greater weight than general language." *See also* 17A Am. Jur. 2d *Contracts* § 356 (2021) ("Generally, where there are general and special provisions in a contract relating to the same thing, the special provisions control. Thus, where there is conflict, uncertainty or inconsistency between general and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions."). Kentucky courts have held the same. *See Dishman v. Dougherty*, Nos. 2013-CA-000558 and 2013-CA-000559, 2015 WL 1966724, at *16 (Ky. Ct. App. May 1, 2015); *Journey Acquisition-11, L.P. v. EQT Prod. Co.*, 39 F.Supp.3d 877, 887 (E.D. Ky. 2014); *L.K. Comstock & Co., Inc. v. Becon Constr. Co.*, 932 F. Supp. 948, 967 (E.D. Ky. 1994). Therefore, Section 4.2, which provides specific guidelines for the Committee to follow when adjusting performance targets, controls over Section 5, which gives the Committee absolute discretion over modifying the SIP. As a result, Plaintiff has stated a viable cause of action against Defendants for changing the performance targets.

Defendants also seek dismissal of Plaintiff's related claim that Defendants breached the SIP by failing to distribute award funds earned by the participants. (Doc. # 12 at 7). Defendants argue that Plaintiff was not owed any other award under the SIP. (*Id.*). But Plaintiff argues otherwise, asserting that "the financial performance of

---

5     Defendants acknowledge that Section 4.2 is the one that governs the performance targets. (Doc. # 12 at 8).

13

Waddington entitles eligible participants, including Evans, to additional payments under the SIP." (Doc. # 16 at 7). Under the motion to dismiss standard, Plaintiff has stated a plausible claim for relief—that he was not payed money owed to him under the SIP. Instead of providing specific details as to how the performance target was revised or how Plaintiff and TWG failed to meet these targets, Defendants simply state that they had the absolute discretion to change the performance targets, which is not supported by the language of the SIP. As Defendants bear the burden of proof to show Plaintiff failed to state a claim for relief, and have not done so, Defendants Motion to Dismiss as it relates to the changing of performance targets and failure to pay award funds earned under the SIP to Plaintiff is **denied.**

### E. Conversion

Plaintiff's Complaint alternatively asserts a claim for conversion if he is unable to recover on his breach of contract claims. (Doc. # 1 ¶¶ 29-31). Defendants argue that Plaintiff's conversion claim is duplicative of his contract claim and alternatively, that Plaintiff did not have legal title to the Award. (Doc. # 12 at 9-10).

Under Kentucky law, "[a]lthough a breach of contract action and a claim for conversion are not necessarily incompatible," *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853-54 (Ky. Ct. App. 2014), a conversion claim does not lie where "the property right alleged to have been converted arises entirely from the contractual rights to compensation," *Davis v. Siemens Med. Sols. USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005). In *Davis*, the plaintiff sued his employer for both breach of contract and conversion for failing to pay him under a commission plan. *Id.* at 788-89. The court opined that because the plaintiff's claim was based on "payment of a disputed debt, not

14

payment for the conversion of a specific asset or specific property right . . . [t]he interpretation of the contract governs [plaintiff's] entitlement to the disputed payments." *Id.* at 801. Because the underlying basis for Plaintiff's conversion claim is Defendants' failure to pay Plaintiff funds allegedly owed to him under the SIP, Plaintiff does not have an actionable conversion claim. *See also Bus. Payment Sys., LLC v. Nat'l Processing Co.*, No. 3:10-cv-00669, 2012 WL 6020400, at *17 (W.D. Ky. Dec. 3, 2012) (relying on *Davis* to dismiss plaintiffs' conversion claim when it was solely based on "monies Plaintiffs believe they are owed pursuant to that agreement."). Therefore, the contract will govern Plaintiff's claims and Defendants' Motion to Dismiss as to Plaintiff's conversion claim is **granted.**

### F. Punitive Damages

Lastly, Plaintiff states a claim for punitive damages if Defendants are found to have wrongfully converted funds. (Doc. # 1 ¶ 32). Because under Kentucky law punitive damages are not generally available in contract, *Nami Res. Co., LLC v. Asher Land & Mineral, Ltd.*, 554 S.W.3d 323, 335 (Ky. 2018), and Plaintiff's conversion claim has been dismissed, punitive damages are not available to Plaintiff. Therefore, Defendants' Motion to Dismiss as far as it addresses Plaintiff's punitive damages claim is **granted.**

### III. CONCLUSION

Thus, for the reasons articulated herein, **IT IS HEREBY ORDERED** as follows:

(1) Defendants' Motion for an Extension of Time to allow for the late filing of their Reply in Support of their Motion to Dismiss, (Doc. # 20), is **GRANTED**;

(2) Defendants' Motion to Dismiss, (Doc. # 12), is **GRANTED IN PART** and **DENIED IN PART**. Specifically:

(a) Plaintiff's breach of contract claim, as far as it alleges that Defendants were required to redistribute forfeited award funds, is **dismissed with prejudice**;

(b) Plaintiff's breach of contract claim, as far as it alleges that Defendants revised the SIP's performance targets and did not pay the balance of the award earned by Plaintiff, **may proceed to discovery**;

(c) Plaintiff's conversion claim is **dismissed with prejudice**;

(d) Plaintiff's punitive damages claim is **dismissed with prejudice**; and

(3) Defendants shall file their Answers **within twenty (20) days**.

This 28th day of May, 2021.

Signed By:
*David L. Bunning*  DB
United States District Judge

O:\DATA\ORDERS\Cov2020\20-98 MOO.docx