**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

**CIVIL ACTION NO. 20-98-DLB-CJS**

**MICHAEL EVANS**                                                               **PLAINTIFF**

**v.**             **MEMORANDUM OPINION AND ORDER**

**NOVOLEX HOLDINGS, LLC, et al.**                                 **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court upon the Motion for Summary Judgment filed by Defendants Novolex Holdings, LLC and The Waddington Group, Inc. ("the Defendants"). (Docs. # 137 and 139).[1] Plaintiff Michael Evans filed a Response (Doc. # 148), and Defendants filed a Reply (Doc. # 157). The Court has reviewed the filings, and for the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. # 137 and 139) is **granted in part and denied in part**. Additionally, the accompanying Motion to Seal (Doc. # 138) is **granted**.

**I.**     **FACTUAL AND PROCEDURAL BACKGROUND**

The complex facts underlying this lawsuit have been outlined in the Court's previous Orders addressing the parties' various Motions to Dismiss. (*See* Docs. # 39, 48, and 118). Thus, the Court will discuss only the necessary facts and procedural history as they are relevant to the instant Motion.

---

[1]     Defendants filed the Motion for Summary Judgment with placeholders for sealed exhibits (Doc. # 137) pursuant to the Agreed Protective Order (Doc. # 47), a Motion to Seal (Doc. # 138), and the Motion for Summary Judgment with the unsealed exhibits (Doc. # 139). For ease of reference, the Court will refer to these filings (Docs. # 137 and 139) as a singular Motion for Summary Judgment.

1

A general summary of the facts as they relate to the remaining claim of breach of contract are quoted here from the March 30, 2023 Order on Defendants' Motion to Dismiss the Amended Complaint (Doc. # 118):

> [The Waddington Group, Inc. ("TWG")] is a corporation with its principal place of business in Covington, Kentucky. Mr. Evans served as the CEO of TWG for more than 20 years, until his retirement at the beginning of 2017. Shortly before Mr. Evans' retirement and in the years immediately following, TWG's ownership changed multiple times in a series of mergers and acquisitions. First, in July 2015, TWG was acquired by Jarden Corporation. After the Jarden acquisition, TWG's new ownership created a Special Incentive Plan ("SIP") "to incentivize and retain certain executives and employees" of TWG. In essence, the SIP was a bonus arrangement which incentivized TWG executives to ensure that the company performed well, as the SIP allowed for "awards . . . tied to the financial performance" of the company from 2016 through 2019. The SIP took effect in March 2016, and Mr. Evans negotiated the SIP with Jarden on behalf of TWG. The bonuses to be paid under the plan were capped at $25 million in total, and the money "was allocated to individual plan participants by separate agreements" with each participant.

(Doc. # 118 at 3) (citations omitted).

After the SIP took effect, Newell Brands, Inc. ("Newell") acquired Jarden, including TWG, and assumed responsibility for the SIP. (*Id.*). Newell re-organized TWG, which included the decision to move sales and marketing responsibilities for the consumer products division (the "Tabletop division") from TWG to a different division of Newell. (Doc. # 139-3 at 98-99). Following that move, the figure used to calculate award amounts under the SIP was adjusted in September 2017. (Doc. # 139-5 at 2).

In June 2018, Newell sold TWG to Novolex Holdings, LLC ("Novolex"), but not before Newell moved the Tabletop division back to TWG. (Doc. # 139-6 at 10). As part of the sale of TWG to Novolex, a prepayment was made to eligible SIP participants and the Administrative Committee amended the SIP to account for the prepayment. (Doc. # 137-4). The early payment covered the period of time from the start of the SIP program

2

until the date of the sale of TWG to Novolex. (Doc. # 139-8). The payout amount was calculated at 60.3% of the target amounts for participants, and Plaintiff received $1,508,652 on March 12, 2019. (*Id.*). Plaintiff was notified that the remaining target award amount for him was $991,348 "subject to the satisfaction of the conditions under the SIP Documents. To the extent the conditions set forth in the SIP Documents are met, any final payment" would be made to him "as soon as possible after December 31, 2019." (*Id.*).

The final remaining issue in this case relates to the adjustment of the SIP following the end of the performance period on December 31, 2019. In April 2020, the Administrative Committee "ratified and confirmed" the adjustment of the earnings floor and ceiling to reflect the return of the Tabletop business to TWG before Novolex's acquisition. (*See* # 139-6 at 10). In doing so, the final payout percentage of the SIP was calculated to 54.6%. (Doc. # 139-7 at 2). Plan participants, including Plaintiff, were notified that no remaining payments were due under the SIP. (Doc. # 139-7 at 2).

Following the decision that no additional payments would be made, Plaintiff filed suit in July 2020 against Novolex and TWG. (Doc. # 1). In May 2021, the Court granted in-part a Motion to Dismiss filed by Defendants, allowing Plaintiff's breach of contract claim to proceed. (*See* Doc. # 39 at 16). One month later, Defendants filed an Answer and asserted counterclaims against Plaintiff, in addition to joining Waddington North America, Inc ("WNA") as a party to bring its own claims against Plaintiff. (Doc. # 45). The Court later granted a Motion to Dismiss filed by Plaintiff (Doc. # 48), and accordingly dismissed all of the counterclaims and other claims by Defendants and WNA against him. (Doc. # 94).

Plaintiff filed an Amended Complaint in March 2022. (Doc. # 97). Defendants' second Motion to Dismiss (Doc. # 100) followed shortly thereafter, which the Court granted in part. (Doc. # 118). The Court allowed Plaintiff to proceed on the single breach of contract theory based on the balance of the incentives earned but not paid after revised performance targets. (*Id.*). The parties proceeded to discovery, and at its close, Defendants filed the instant Motion for Summary Judgment (Docs. # 137 and 139) which is ripe for review.

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (internal quotation marks and bracketing omitted). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (bracketing omitted).

"The moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The

movant may do so by "citing to particular parts or materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. It must produce evidence showing that a genuine factual issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

This suit is in federal court on the basis of diversity jurisdiction. (*See* Doc. # 13 at ¶¶ 22-26). "When determining which state's substantive law to apply, federal courts sitting in diversity look to the conflict of laws rules in the forum state, in this case, Kentucky." *Asher v. Unarco Material Handling, Inc.*, 737 F.Supp.2d 662, 667 (E.D. Ky. 2010) (citing *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001)). This Court has previously applied Kentucky's rules regarding choice of law and determined that Kentucky law applies to Plaintiff's claim. (*See* Doc. # 39 at 5-8).

**B.     Discussion**

Defendants argue that they are entitled to summary judgment because (1) the Administrative Committee had full discretion to adjust the amounts in Section 4.2 to reflect the move of the Tabletop business; (2) there is no evidence Plaintiff was due additional payment, and in fact, Defendants believe he was overpaid based on the new metrics; and (3) the SIP did not require any written notice to Plaintiff or those similarly situated before adjustment of the award amounts.  (Doc. # 137 at 11, 13-15).

Plaintiff counters that there are genuine disputes of material fact that preclude summary judgment.  First, Plaintiff argues that the performance targets were not changed during the performance period, with the ratification of the new targets occurring after the end of the period.  (Doc. # 148 at 8-15).  Plaintiff argues that Section 4.2 of the SIP required the assessment be made to reflect the actual financial result of mergers and acquisitions at the time of the determination, and Defendants did not do so.  (*Id.* at 16).  Plaintiff also argues that Defendants did not act in good faith with respect to its calculations, and that "law and basic logic mandate that if Defendants were going to adjust the Targets . . . Defendants needed to inform the SIP participants of that adjustment."  (*Id.* at 20, 24).

In their Reply, Defendants argue that none of the "disputed facts" that Plaintiff argues are material to the issue of whether Defendants breached the contract, and therefore do not preclude summary judgment.  (Doc. # 157 at 1-2).  Defendants also argue that Plaintiff fails to demonstrate any ascertainable damages, and because damages are an essential element of a breach of contract claim, the breach of contract claim fails as a matter of law.  (*Id.*).

### 1.     The Decision to Adjust the SIP and Subsequent Ratification

The Court begins by addressing Plaintiff's argument that the Defendants improperly adjusted the award amounts in the SIP after the performance period ended. In Kentucky, a breach of contract claim consists of (1) the existence of a contract; (2) a breach of that contract; and (3) damages flowing from the breach. *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007). "'In the absence of ambiguity, a written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 690, 687 (Ky. 2012) (quoting *Frear v. P.T.A. Indust., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)). "[W]ords in a contract are to be given their 'ordinary meaning as persons with ordinary and usual understanding would construe them.'" *Sunny Ridge Enters, Inc. v. Fireman's Fund Ins. Co., Inc.*, 132 F. Supp. 2d 525, 526 (E.D. Ky. 2001) (quoting *Transp. Ins. Co. v. Ford*, 886 S.W.2d 901, 904 (Ky. App. 1994)). Here, there is no dispute that the SIP was a valid contract between the parties. (Doc. # 11). Plaintiff argues that the breach of the contract occurred with respect to the adjustment of the performance targets. (Doc. # 148).

Section 4.2 of the SIP explains the process for adjusting the performance targets:

> The Administrative Committee . . . may modify the rates or dollar amounts in the preceding clause (b) due to the material change in resin prices that the Administrative Committee determines have had a material impact on TWG's financial performance. In addition, the Administrative Committee . . . may adjust the dollar amounts in this Section 4.2 to reflect the results of mergers, acquisitions, divestitures, or other business combinations that have had at the time of such determination, an impact on TWG's financial performance; provided that such adjustments shall be made by the Administrative Committee solely to reflect the actual financial results of any acquired or divested businesses.

7

(Doc. # 11 at 3).

Plaintiff spends the majority of his Response arguing that there is no evidence that the performance targets were modified during the performance period, and the ratification of the new targets occurring after the end of the period was an improper ad hoc attempt to justify the change in targets. (Doc. # 148 at 6-15). Defendants disagree and point to a number of exhibits that demonstrate that Administrative Committee members had discussed how the Tabletop business was going to be included in the final metrics. (Doc. # 157 at 5).

However, Plaintiff does not identify any specific language in the SIP that would require the Administrative Committee to undergo a specific process to adjust the amounts under Section 4.2. Nor does the SIP require the decision to occur within a certain time period. The SIP permitted the Administrative Committee to adjust the dollar amounts "to reflect the result of mergers, acquisitions, divestitures, or other business combinations that have had **at the time of such determination**, an impact on TWG's financial performance; provided that such adjustments shall be made by the Administrative Committee solely to reflect the actual financial results of any acquired or divested businesses." (Doc. # 11 at 3) (emphasis added). Assigning the words in the SIP their ordinary meaning, the Administrative Committee was permitted to consider the Tabletop business when it made the decision to adjust the amounts in April 2020, so long as the adjustment reflected the actual financial results of the acquisition. Plaintiff points to no restrictions in the SIP or otherwise where the Administrative Committee was required to make the changes during a specific time period following the acquisition, or through any specific deliberative process. It simply does not matter whether Plaintiff believes that the

8

amounts should have been formally adjusted prior to the April 2020 date, because the SIP placed no such requirements on the Administrative Committee.

### 2. The Actual Financial Results of the Reacquisition of the Tabletop Business

Though the Administrative Committee was not required to complete the adjustment process within a certain time period or through a specific deliberative process, the amounts were required to reflect the actual financial results of any acquisitions or mergers. (Doc. # 11 at 3). In his Response to the Motion for Summary Judgment, Plaintiff points to a New York lawsuit filed by Defendant Novolex against Newell, the company that acquired the Tabletop business in 2017. (Doc. # 148 at 17-18). Therein, Novolex filed suit against their insurers for failing to pay for losses that occurred while Newell had control of Tabletop, essentially arguing that Tabletop was not worth the same amount when Defendants reacquired the Tabletop business due to Newell's conduct. (*Id.*) (citing Amend. Compl., *Novolex Holdings, LLC v. Illinois Union Ins. Co. Lloyds Syndicate 4000, et al.*, No. 655514/2019 (N.Y. Sup. Ct. Dec. 2, 2020) [hereinafter "New York Litigation"]).

Section 4.2 of the SIP allows a wide latitude for the Administrative Committee to adjust the SIP amounts "to reflect the result of mergers, acquisitions, divestitures, or other business combinations that have had *. . .* an impact on TWG's financial performance; provided that such adjustments . . . **solely to reflect the actual financial results of any acquired or divested businesses**." (Doc. # 11 at 3) (emphasis added). In the case before this Court, Defendants maintain that the adjustment of the SIP accounted for the Tabletop division being folded back into TWG in 2018. (Doc. # 137 at 11). Defendants argue that the SIP award amounts were adjusted back to the same amount that they were in 2017, before the Tabletop business was moved to another division of Newell. (*Id.*).

9

But in the New York Litigation, Defendant Novolex expressly claims that due to Newell's ownership, the Tabletop division was not worth the same amount that it was when they sold it.  See Amend. Compl. at ¶ 15, New York Litigation.  In fact, Defendant Novolex claims a business loss of $267 million.  See Amend. Compl. at ¶ 15, New York Litigation.

Both cannot be true.  If the Tabletop business was not worth the same amount as when it was initially divested, then it is at the very least a genuine dispute of material fact whether the Administrative Committee adjusted the SIP award amounts based on the "actual financial results" of the reacquired Tabletop business.  Defendants do not address the New York Litigation anywhere in their Motion for Summary Judgment or their Reply after Plaintiff raised it in his Response (Doc. # 148 at 17-18).

As noted above, the Defendants bear the burden of showing the absence of any genuine issues of material fact, and the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  See Sigler, 532 F.3d at 483; Matsushita Elec. Indus. Co., 475 U.S. at 587.  For this reason, Defendants' Motion for Summary Judgment (Doc. # 137 and 139) is **denied in part** on this issue, as Plaintiff has demonstrated a genuine dispute of material fact: whether Defendants breached the SIP by failing to adjust the award amounts based on the "actual financial results" of acquisitions as required in Section 4.2 of the SIP.  The Court will now address Plaintiff's remaining theory of breach.

### 3. Failure to Act in Good Faith

Plaintiff next argues that the SIP required the Administrative Committee to act in good faith, and there is a genuine dispute of material fact as to whether Defendants breached the contract by not doing so.  (Doc. # 148 at 20) (quoting Doc. # 11 at 2) ("The

10

Administrative Committee will act in good faith in attempting to make accurate calculations of EBITDA and Revenue for each of the years in question."). Plaintiff argues that Defendants failed to act in good faith by including the Tabletop business in the metrics to adjust the SIP despite its losses detailed in the New York Litigation, revising the amounts after the performance period ended, revising the amounts with no notice to the participants, and recovering Tabletop losses from Novolex's representations and warranties insurers without crediting TWG for those amounts.[2] (Doc. # 148 at 20-21). Plaintiff cites to *Miller v. Trimont Glob. Real Est. Advisors LLC* as an example of a court finding bad faith where an employer withheld funds from a deferred compensation agreement to an ex-employee. (*Id.*) (quoting *Miller v. Trimont Glob. Real Est. Advisors LLC*, 587 F. Supp. 3d 170 (D. Del. 2022)).

The implied covenant of good faith and fair dealing is present within every contract, and it "imposes on the parties thereto a duty to do everything necessary" to carry out the contract's terms. *Farmers Bank & Trust Co. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4 (Ky. 2005) (internal citations omitted). In other words, the implied covenant "prevent[s] one party from impairing the right of the other party to receive the fruits of the contract.'" *Ligon v. Parr*, 471 S.W.2d 1, 3 (Ky. 1971) (internal quotations omitted); *see also Mountain Motorsports Paving & Constr. LLC v. Yamaha Motor Corp., U.S.A.*, No. 7:14-CV-76-ART, 2014 WL 5341865, at *5 (E.D. Ky. Oct. 20, 2014). The implied covenant of good faith and fair dealing only prohibits a party from "denying the benefits intended" by a contractual

---

[2] The amount that Defendant Novolex received from its insurers for the loss is currently in dispute in the New York Litigation, with Novolex arguing that it is entitled to the full policy amount of $150 million. *See* Amend. Compl., New York Litigation, at ¶ 4. Neither party discusses the amount that was initially received, how this amount would have impacted the SIP award amounts, or how much Plaintiff would be owed if it was required to be considered in the adjustment of the award amounts.

11

agreement – those benefits specifically bargained for and which a contract entitles a party to receive upon completing his end of the deal. *Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 776 (6th Cir. 2009) (citing *Farmers Bank*, 171 S.W.3d at 11).

The Court previously addressed Plaintiff's claim for breach of good faith in the March 30, 2023 Memorandum Opinion and Order with respect to a now-dismissed forfeiture theory. (Doc. # 118 at 16-17). The Court noted that the Sixth Circuit previously rejected a claim of breach of good faith and fair dealing "[w]here the contracting party complains of acts of the other party that are specifically authorized in their agreement . . . . Indeed, it would be a contradiction in terms to characterize an act contemplated by the plain language of the parties' contract as a bad faith breach of that contract." (*Id.* at 17) (quoting *La Quinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 338 (6th Cir. 2010) (internal quotations omitted)); *see also Travelers Ins. Co. v. Corporex Props. Inc.*, 798 F. Supp. 423, 425 (E.D. Ky. 1992) ("It is not 'inequitable' or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained.).

Defendants were expressly permitted under the SIP to make adjustments to the award amounts based on acquisitions, so Plaintiff's argument that it was bad faith for the Administrative Committee to do so is unavailing. Section 5 of the SIP indicates that the Administrative Committee has the "authority to prescribe, amend and rescind rules and regulations relating to the Plan, to provide for conditions deemed necessary or advisable to protect the interests of [the Participants], to interpret the Plan and to make all other determinations necessary or advisable for the administration and interpretation of the Plan and to carry out its provisions and purposes." (Doc. # 11 at 4). Plaintiff has not

12

pointed to any fact in the record that demonstrates bad faith conduct by the Administrative Committee in the process of adjusting the SIP award amounts.

To support his arguments about timing and notice, Plaintiff references literature provided by the Society of Human Resource Management ("SHRM"). (Doc. # 148 at 24). In *Designing Executive Compensation Plans*, SHRM explains the importance of "clearly defin[ing] performance goals up front" and that employers should not "chang[e] performance standards midstream" or "judg[e] employee performance according to standards that were not stated in written documentation." (*Id.*) (quoting Doc. # 148-15 at 3). Plaintiff argues that because Defendants did not provide notice about the changes to the SIP targets, they did not abide by these guidelines.

Perhaps Defendants did not adhere to best practices according to the SHRM, but the Plaintiff fails to show this would rise to the level of failing to administer the SIP in good faith. The SIP contains no language that would require the Administrative Committee to make adjustments to the target amounts within a specific time period. Nor does any portion of the SIP require the Administrative Committee to provide notice to the SIP participants before doing so, or credit TWG for any amounts recovered from Novolex's representations and warranties insurers (especially when the amount is currently the subject of pending litigation). Thus, the Administrative Committee's timing of the adjustment, failure to provide notice to SIP participants, or failure to credit SIP participants for the amounts recovered cannot be examples of bad faith conduct.

While the Court does find a genuine dispute of material fact with respect to whether Defendants complied with Section 4.2 of the SIP in calculating the "actual financial results" of the Tabletop reacquisition, Plaintiff has not demonstrated that Defendants did

13

so in violation of its obligation to operate in good faith. As noted above, the Defendants were in compliance with the required administrative procedures used to adjust the target amounts in the SIP. The timing of the adjustment was not inappropriate, and the Administrative Committee was not required to provide notice to the SIP participants of the change. While there are remaining questions about the proper method of calculation for adjusting the award amounts, Plaintiff fails to cite any evidence that indicates the Defendants made the changes in bad faith.

Plaintiff compares this case to *Miller*, where a former employee brought a breach of contract claim against his former employer related to his deferred compensation agreement. (Doc. # 148 at 21) (quoting *Miller*, 587 F. Supp. 3d at 174). In that case, the court found evidence of bad faith where the employee was terminated "for cause," which prevented him from receiving his additional compensation, despite no evidence that he was actually terminated for cause. *Miller*, 587 F. Supp. 3d at 173. The court found that there was a breach of contract based on the CEO's bad faith tactics that induced the board to find cause to forfeit the employee's deferred compensation plan. *Id.* at 197. Specifically, the CEO attempted to encourage the employee to stay with the company with no change in pay or title, but under a new scheme that would force the employee to resign or lead to firing if he failed to meet certain employment standards. *Id.* at 197-98. When the employee offered a counterproposal, the CEO characterized it as a resignation and blocked the employee's access while the CEO negotiated for the employee's resignation and threatened to terminate his employment. *Id*. The court found that it was bad faith conduct for the CEO to mislead the board that the employee was fired for cause, which ultimately lead to the forfeit of his deferred compensation. *Id.* at 198.

14

Here, Plaintiff points to no such evidence of lack of candor to the board, or any nefarious motive at all. While he may proceed with a claim for breach of contract based on the calculation of the actual results of the reacquisition of the Tabletop business, he does not cite to any genuine dispute of material fact that would indicate that Defendants acted in bad faith in violation of the SIP. Thus, Defendants' Motion for Summary Judgment (Docs. # 137 and 139) is **granted** with respect to Plaintiff's breach of contract claim as it relates to Plaintiff's theory that Defendants acted in bad faith.

### 4. Uncertainty of Damages

Defendants argue that even if they breached the SIP, Plaintiff is unable to prove damages flowing from the breach, and because damages are an essential element of a breach of contract claim, Plaintiff's claim fails as matter of law. (Doc. # 137 at 25; Doc. # 157 at 15). The Court agrees that it is not clear whether Plaintiff would be entitled to the original $991,348 he was owed under the SIP before the Administrative Committee adjusted the target amounts. (*See* Doc. # 139-8). The damages are dependent on (1) whether the Administrative Committee should have calculated the losses outlined in the New York Litigation as part of the "actual results" of the reacquisition of the Tabletop business and if so, (2) what impact that would have on the calculation of the target amounts. Neither party asserts what Plaintiff is owed under those circumstances. However, that uncertainty does not preclude Plaintiff from relief under Kentucky law.

Typically, "contingent, uncertain and speculative damages generally may not be recovered" under Kentucky law. *Curry v. Bennett*, 301 S.W.3d 502, 506 (Ky. Ct. App. 2009) (citing *Spencer v. Woods*, 282 S.W.2d 851, 852 (Ky. 1955)). However, "where it is reasonably certain that damage has resulted, mere uncertainty as to the amount does not

15

preclude one's right of recovery or prevent a jury decision awarding damages." *EQT Prod. Co. v. Magnum Hunter Prod. Co.*, 266 F. Supp. 3d 961, 973 (E.D. Ky. 2017) (quoting *Curry*, 301 S.W.3d at 506)).

As noted above, Plaintiff has indicated a genuine dispute of material fact that precludes summary judgment—whether Defendants breached the SIP by failing to properly calculate the "actual results" of the reacquisition of the Tabletop business. Based on applicable Kentucky law, Plaintiff's failure to include specific evidence of damages does not entitle Defendants to summary judgment on this claim.

### C. Motion to Seal (Doc. # 138)

Defendants have filed a Motion for Leave to Seal pursuant to Local Rule 5.6 and ¶ 6 of their Agreed Protective Order (Doc. # 47) because the exhibits included with their Motion for Summary Judgment "include documents and deposition testimony that discuss and reflect sensitive personal and commercial information." (Doc. # 138). A "party seeking to seal records has the heavy burden of overcoming the strong presumption in favor of openness." *Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 637 (6th Cir. 2019) (quoting *Shane Grp., Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 305 (6th Cir. 2016)) (internal quotation marks omitted). "To meet this burden, the party must show three things: (1) a compelling interest in sealing the records; (2) that the interest in sealing outweighs the public's interest in accessing the records; and (3) that the request is narrowly tailored." *Id.* The privacy interests of third parties "weigh heavily in a court's balancing equation." *Shane Grp., Inc.*, 825 F.3d at 308. The public has a recognized interest in "ascertaining what evidence and records [courts] have relied upon in reaching . . . decisions," *id.* at 305, and in case information involving subject matters such as

16

"discrimination, voting rights, antitrust issues, government regulation, [and] bankruptcy." *Lipman v. Budish*, 974 F.3d 726, 753 (6th Cir. 2020). Courts routinely seal records "when interests of privacy outweigh the public's right to know." *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 474 (6th Cir. 1983).

As an initial matter, the Court notes that Plaintiff did not respond to the Motion for Leave to Seal. In the absence of any opposition from Plaintiff, the Court concludes that it need not specifically address the Motion on the merits. *See* L.R. 7.1(c) ("Failure to timely respond to a motion may be grounds for granting the motion."). That said, the Court briefly addresses the Motion's merits as follows. Upon review, it appears that the redacted portions of the briefs and exhibits relate to Defendants' confidential information—the latter of which deserves special protection. *See Shane Grp., Inc.*, 825 F.3d at 305. Additionally, the Court did not rely on the redacted information to resolve any issues in this case, which does not involve the special subject matters listed above. Thus, the interests of privacy appear to outweigh any apparent public interest in the redacted information. Moreover, it appears that Defendants narrowly tailored the redactions to protect specific confidential information. Based on the above, the Motion for Leave to Seal (Doc. # 138) is **granted**.

### III.  CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. # 137 and Doc. # 139) is **GRANTED IN PART AND DENIED IN PART** as set forth herein; and

(2) Defendants' Motion for Leave to Seal a Document (Doc. # 138) is **GRANTED**.

This 11th day of March, 2024.



Signed By:
*David L. Bunning*   DB
United States District Judge

K:\DATA\ORDERS\Cov2020\20-98 MOO re MSJ.docx